## Docket No. 2016-1663

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

NORMA E. CAQUELIN and KENNETH CAQUELIN,
For Themselves and as Representatives of a Class of Similarly Situated Persons,

*Plaintiffs-Appellees,*

v.

UNITED STATES,

*Defendant-Appellant.*

Appeal from the United States Court of Federal Claims
*in Case No. 1:14-cv-00037-CFL · Honorable Charles F. Lettow.*

## APPELLEE'S RESPONSE TO APPELLANT'S
## CORRECTED OPENING BRIEF, OPPOSITION TO *EN BANC*
## REVIEW, AND MOTION FOR SUMMARY AFFIRMANCE

THOMAS S. STEWART, ESQ.
ELIZABETH MCCULLEY, ESQ.
STEWART WALD & MCCULLEY, LLC
2100 Central, Suite 22
Kansas City, Montana 64108
(816) 303-1500 Telephone
(816) 527-8068 Facsimile

*Attorneys for Plaintiffs-Appellees,*
*Norma E. Caquelin and Kenneth Caquelin*

December 21, 2016



PRINTED ON RECYCLED PAPER 

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Caquelin _____ **v.** United States _____

Case No. ____16-1663____

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

__Appellee_____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.   The full name of every party or amicus represented by me is:

Kenneth Caquelin and Norma Caquelin

2.   The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

None

3.   All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4. ⊠   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Stewart Wald & McCulley, LLC, Thomas S. Stewart

December 21, 2016                              /s/ Elizabeth McCulley
_____          _____
           Date                                         Signature of counsel

Please Note: All questions must be answered

cc: ___Thomas S. Stewart_____          Elizabeth McCulley
                                              _____
                                                   Printed name of counsel

Reset Fields

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ...................................................... iii

STATEMENT OF RELATED CASES ................................... vii

INTRODUCTION ........................................................................1

STATEMENT OF THE ISSUES...........................................6

STATEMENT OF THE CASE..............................................7

STATEMENT OF THE FACTS ............................................7

SUMMARY OF THE ARGUMENT ......................................9

ARGUMENT ..............................................................................10

I.    THE GOVERNMENT IS LIABLE FOR A FIFTH
      AMENDMENT TAKING UNDER TWO DECADES OF
      FEDERAL CIRCUIT PRECEDENT ................................10

II.   THIS COURT SHOULD DENY *EN BANC* REVIEW BECAUSE
      THIS COURT HAS PREVIOUSLY HELD *EN BANC* THAT
      THE GOVERNMENT'S INVOCATION OF § 8(d) OF THE
      TRAILS ACT GIVES RISE TO A TAKINGS CLAIM....................19

      A.    The Issuance of the NITU Marks the Finite Start to
            Either Temporary or Permanent Takings Claims ....................19

      B.    The Government's Attempt to Override *Ladd I* and
            *Caldwell* Must Fail....................................25

III.  THE TAKING OF LANDOWNERS' RIGHTS TO THE
      EXCLUSIVE PHYSICAL POSSESSION OF THEIR
      PROPERTY IS NOT A REGULATORY TAKING ..........................28

A.    The Federal Circuit's Decisions in *Caldwell, Barclay, Illig, and Ladd I* Were All Compelled By, and Consistent With, the Supreme Court's Taking Clause Jurisprudence........28

B.    The Federal Circuit Has Already Ruled That Physical Occupation is Not Required and Has Already Rejected the Notion that the NITU is Nothing More Than a Temporary Regulatory Hold......................................................31

C.    The Government's Attempt to Relitigate Settled Law is Frivolous........................................................................36

IV.    THE DURATION OF THE TAKING RELATES TO DAMAGES NOT LIABILITY......................................................40

V.    CONCLUSION ...................................................................45

CERTIFICATE OF SERVICE ...............................................................47

CERTIFICATE OF COMPLIANCE......................................................48

# TABLE OF AUTHORITIES

## CASES

*Arkansas Game & Fish Comm'n v. United States*,
    133 S. Ct. 511 (2012)................................................................35, 41

*Barclay v. United States*,
    443 F.3d 1368 (Fed. Cir. 2006) ...........................................*passim*

*Boling v. United States*,
    220 F.3d 1365 (Fed. Cir. 2000) ....................................................33

*Boston Chamber of Commerce v. Boston*,
    217 U.S. 189 (1910)......................................................................40

*Brandt v. United States*,
    134 S. Ct. 1257 (2014).........................................37, 38, 39, 43, 44

*Bright v. United States*,
    603 F.3d 1273 (Fed. Cir. 2010) .............................................16, 17

*Caldwell v, United States*,
    391 F.3d 1226 (Fed. Cir. 2004), *cert. denied*, 546 U.S. 826 (2005) ......*passim*

*Citizens Against Rails-to-Trails v. Surface Transportation Bd.*,
    267 F.3d 1144 (D.C. Cir. 2001).....................................................13

*Creppel v. United States*,
    41 F.3d 627 (Fed. Cir. 1994) ........................................................22

*Ellamae Phillips Co. v. United States*,
    564 F.3d 1367 (Fed. Cir. 2009) ....................................1, 15, 16, 17

*Evans v. United States*,
    694 F.3d 1377 (Fed. Cir. 2012) ....................................................39

*First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*,
    482 U.S. 304 (1987)......................................................................42

*Hardy v. United States*,
    No. 14-388, Oct. 28, 2015 Oral Argument Tr. at 68 .....................40

*Hash v. United States*,
    403 F.3d 1308 (Fed. Cir. 2005) ...........................................................15, 17, 38

*Hastings & D.R. Co. v. Whitney*,
    132 U.S. 357 (1889)...................................................................................18

*Hendler v. United States*,
    952 F.2d 1364 (Fed. Cir. 1991) ............................................................5, 34

*Horne v. Department of Agriculture*,
    135 S. Ct. 2419 (2015)...............................................................................41

*Illig v. United States,*
    274 Fed. Appx. 883 (Fed. Cir. 2008), *cert. denied,*
    129 S.Ct. 2860 (2009).........................................................................*passim*

*Illig v. United States*,
    67 Fed. Cl. 47 (Fed. Cl. 2005).................................................................23

*Illig v. United States*,
    Supreme Court No. 08-852, Br. of U.S.
    in Opp'n to Pet. For Writ of Cert...............................................................24

*John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345
    (Fed. Cir. 2006), *aff'd*, 128 S. Ct. 750 (2008) .............................................24

*Joshua v. United States*,
    17 F.3d 378 (Fed. Cir. 1994) .......................................................................1

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979)...................................................................................29

*Kelo v. City of New London*,
    545 U.S. 469 (2005)...................................................................................29

*Kirby Forest Ind. Inc. v. United States*,
    467 U.S. 1 (1984)........................................................................................42

*Ladd v. United States*,
    630 F.3d 1015 (Fed. Cir. 2010) (*Ladd I*) ...............................................*passim*

*Ladd v. United States*,
    713 F.3d 648 (Fed. Cir. 2013) (*Ladd II*)...................................................27

*Leo Sheep Co. v. United States*,
    440 U.S. 668 (1979).................................................................. 18, 43-44

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)................................................................... 29-30

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003 (1992) ...............................................29-30, 41-42

*Monongahela Nav. Co. v. United States*,
    148 U.S. 312 (1893)..........................................................................42

*National Wildlife Federation v. I.C.C.*,
    850 F.2d 694 (D.C. Cir. 1988).......................................................13

*Nollan v. Cal. Coastal Comm'n*,
    483 U.S. 825 (1987).........................................................................32

*Penn Central Trans. Co. v. City of New York*,
    438 U.S. 104 (1978)............................................................... 29-30, 35

*Phipps v. United States*,
    No. 14-424L Summ. Jud. Oral Argument Tr. at 12-13, Oct. 1, 2015 ..........40

*Preseault v. Interstate Commerce Comm'n*,
    853 F.2d 145 (2nd Cir. 1988)........................................................10

*Preseault v. Interstate Commerce Commission*,
    494 U.S. 1 (1990) (*Preseault I*) .............................................*passim*

*Preseault v. United States*,
    100 F.3d 1252 (1996) (*en banc*)
    (*Preseault II*)...........................................................................*passim*

*Renewal Bodyworks, Inc. v. United States*,
    64 Fed. Cl. 609 (Fed. Cl. 2005)..............................................16, 21

*Ruckelshaus v. Monsanto*,
    467 U.S. 986 (1984)........................................................................41

*Samuel C. Johnson 1988 Trust v. Bayfield Cnty., Wis.*,
    649 F.3d 799 (7th Cir. 2011) .........................................................38

v

*San Diego Gas & Elec. Co.* v. *San Diego*,
  450 U.S. 621 (1981)....................................................................................41

*St. Bernard Parish Government v. United States*,
  121 Fed. Cl. 687 (2015)..............................................................................40

*Stop the Beach Renourishment, Inc. v. Fla. Dept. of Envtl. Protection*,
  560 U.S. 702 (2010).....................................................................................18

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
  535 U.S. 302 (2002).....................................................................................29

*Toews v. United States*,
  376 F.3d 1371 (Fed. Cir. 2004) .......................................................1, 15, 17

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980).....................................................................................18

*Yuba Natural Res., Inc. v. United States*,
  821 F.2d 638 (1987) ....................................................................................34

## STATUTES

National Trails System Act Amendments of 1983,
  16 U.S.C. § 1247(d)...........................................................1, 9, 16, 18, 40, 42

Tucker Act, 28 U.S.C. § 1491....................................................................8

## MISCELLANEOUS OR OTHER

Restatement (Third) of Property: Servitudes § 1.21(1) (1998) ..............................39

J. Ely, Railroads and American Law 51 (2001).......................................................39

## STATEMENT OF RELATED CASES

No appeals from the same civil action were previously before this Court or any other appellate court. Undersigned counsel is not aware of any pending related cases within the meaning of Federal Circuit Rule 47.5.

# INTRODUCTION

This is an action pursuant to the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act"). The government asks this Court to sit *en banc* to overturn four of this Court's prior decisions and to adopt an entirely new view of the takings clause that is contrary to both this Court's and the Supreme Court's jurisprudence. This Court should not overturn its prior decisions and rewrite its takings clause jurisprudence. This is actually an area of well-settled law, there is no need for an *en banc* review of the issues in this case, and the Court of Federal Claims ruling should actually be summarily affirmed.[1]

Landowners all over the United States and the federal government have been litigating Trails Act cases for thirty years. The government's liability in Trails Act takings has been settled by the Supreme Court's opinion in *Preseault v. Interstate Commerce Commission*, 494 U.S. 1 (1990) (*Preseault I*) and the Federal Circuit's decisions in *Preseault v. United States*, 100 F.3d 1252 (1996) (*en banc*) (*Preseault II*), *Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004), and *Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009).

---

[1] As the Federal Circuit has pointed out, "summary affirmance of a case is appropriate, *inter alia*, when the position of one party is so clearly correct as a matter of law that no substantial question regarding the outcome of the appeal exists. *See Illig v. United States*, 274 Fed. Appx. 883 (Fed. Cir. 2008) (citing *Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994)). In this case, Plaintiffs/Appellees' position is clearly correct as a matter of law.

In *Preseault I*, the government argued, as they now argue in this case, that the Trails Act is at most a regulatory taking, that "railbanking is a railroad purpose," and that the original easement was either not abandoned or "railbanking" the former railroad corridor is a use within the scope of the original easement. The government's arguments have been soundly rejected by the Supreme Court, the Federal Circuit (sitting *en banc*), and subsequently by several panels of the Federal Circuit.

Indeed, when the government made these early arguments to the Supreme Court, Chief Justice Rehnquist and Justice Scalia mocked the government and the Court broke into laughter. During argument in *Preseault I*, Chief Justice Rehnquist said the government's argument is "like saying if my aunt were a man she would be my uncle."[2] Justice Scalia then responded by describing the government's argument:

> The ICC didn't order the railroad to keep running. Saying the railroad could have continued using [the land] for rail purposes so you really haven't lost anything. In fact, they didn't, but they might have. Even though you have a deed that says if we stop using it for rail purposes it's yours, you say, well you haven't lost anything because, yeah, they have stopped using it for rail purposes but they might not have. That's not very appealing to me.[3]

---

[2] Oral Argument, *Preseault I*, 494 U.S. 1 (1990); available at https://www.oyez.org/cases/1989/88-1076 (last visited October 4, 2016).

[3] *Id*.

Following the Supreme Court's holding in *Preseault I* in 1990, and this Court's holding six years later in *Preseault II* in 1996, the government then sought to limit its liability by successfully arguing that it is the initial invocation of § 8(d) of the Trails Act that gives rise to an owner's claim and, therefore, an owner must bring that claim within the six-year statute of limitations from that date or be forever barred from seeking compensation.  *See Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004); *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006); *Illig v. United States*, 274 Fed. Appx. 883 (Fed. Cir. 2008), *cert. denied,* 129 S. Ct. 2860 (2009).  The government won this argument and thereby avoided paying thousands of landowners who otherwise had a compensable claim.

Then, almost twenty years after the Supreme Court decided *Preseault I,* the government reversed course and resurrected its argument in this Court that invoking § 8(d) caused nothing more than a "temporary regulatory taking" and would not cause an owner's claim for compensation to accrue.  Judge Moore chastised the government saying, "That's the argument you made unsuccessfully in the Supreme Court where Justice Scalia seemed to actually make fun of you?  I mean, I don't think that's going to work on us at this point.  You can't say 'oh yea, well they didn't lose anything because they didn't have anything the day before.'"[4]

---

[4]   *Ladd   I*,   Oral   argument   held   Sept.   7,   2010.    Available   at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2010-5010.mp3 (12:37-13:02).

3

This Court rejected the government's argument.  *See Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010) (*Ladd I*).  The government then asked this Court to rehear *Ladd I.*  This Court specifically held that, "[T]he [order invoking § 8(d)] is the government action that prevents the landowners from possession of their property unencumbered by the easement."  *Id.* at 1023.  The government sought rehearing *en banc* of *Ladd I* and the Federal Circuit rejected rehearing.  *See Ladd I*, 646 F.3d 910.

As part of this new attack, the government now asks this Court to stand the Supreme Court's taking jurisprudence on its head (*Preseault I*) and to overturn its own precedent from *Caldwell*, *Barclay*, *Illig*, and *Ladd I.*  This Court has already previously denied *en banc* review of the exact issues now raised in this case by the United States that were previously raised by plaintiffs in *Caldwell* and *Barclay* where the United States actually made the opposite argument that it is now making in this case—in both *Caldwell* and *Barclay*, the United States argued that the issuance of a NITU blocking state law reversionary interests is the trigger for accrual of a takings claim.  The government admits that *Caldwell* and *Ladd I* (they basically ignore *Barclay*) are precedential decisions, yet ask this Court to rule contrary to all of its prior decisions.

Furthermore, the argument now advanced again by the government, that Trails Act takings should be analyzed under a regulatory takings framework, has

also been rejected by this Court in *Ladd I*. This Court specifically rejected the government's suggestion that the "NITU is nothing more than a temporary regulatory hold on the railroad's authority to abandon its railway" and "rejected that two takings might occur—a regulatory taking followed by a physical taking" and instead held that "a taking occurs when the owner is deprived of use of the property" by blocking the reversionary interest. *Ladd I*, 630 F.3d at 1025. As affirmed in *Caldwell*, *Barclay* and *Ladd I*, when the government invokes § 8(d) and reversionary property interests are blocked, if a trail use agreement is not reached, the taking may be temporary but still compensable. While the taking may be temporary, as this Court acknowledged, it is still a *per se* physical taking. *See Ladd I*, 630 F.3d at 1025; *Caldwell*, 391 F.3d at 1234; *Barclay*, 443 F.3d at 1378; *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991).

The government does not dispute that the railroad only held an easement for railroad purposes and that the Caquelins own the underlying fee in the railroad corridor. The government's tired refrain now once again disputes whether a taking occurred based on facts occurring after the issuance of the NITU. This Court has already rejected that precise argument on numerous occasions by consistently holding that the government's invocation of § 8(d) blocks state law reversionary property interests and constitutes a taking. As indicated in *Caldwell, Barclay,* and *Ladd I,* where no trail use agreement is ultimately reached, the taking may be

temporary and facts occurring after the NITU apply to the duration of the take and the extent of damages.

This Court is bound by previous precedential decisions until overturned by the Supreme Court or this Court *en banc*. *See Barclay,* 443 F.3d at 1373*; Ladd I,* 630 F.3d at 1023. After *Preseault II,* this Court has declined to rehear Trails Act takings cases *en banc* because the law in this area is now and has been very well-settled. Despite the government's mischaracterizations of the Trails Act, the contrary arguments now made by the government to positions previously taken, and the blatant attempt to reargue decades of previous decisions by this Court, the ruling by the Court of Federal Claims in this case, that the issuance of the NITU blocks the reversionary property interests of the Caquelins and a taking occurs, follows all of the precedent from this Court as enunciated in *Preseault II*, *Caldwell*, *Barclay*, *Illig*, and *Ladd I.* This Court should deny *en banc* review.

## STATEMENT OF THE ISSUES

1. Whether the CFC correctly ruled that a taking occurs when the STB invokes § 8(d) of the Trails Act and blocks Plaintiffs' reversionary interest in their land;

2. Whether facts occurring after § 8(d) is invoked do not affect liability but, rather, potentially affect the duration of the taking and damages; and

3. Whether this Court should overturn its prior decisions in *Caldwell*, *Barclay*, *Illig,* and *Ladd I* or, alternatively whether this Court should summarily affirm the CFC's ruling based on the well-settled law as enunciated in *Caldwell*, *Illig, Barclay*, and *Ladd I.*

## STATEMENT OF THE CASE

On January 16, 2014, Plaintiffs filed their lawsuit against the United States alleging that it committed an uncompensated taking of their property. Plaintiffs alleged that the railroad held easements limited to railroad purposes that were exceeded by issuance of the NITU by the STB that rendered the government liable for taking the Caquelins' property without compensation under the Fifth Amendment. The parties filed cross-motions for summary judgment and the CFC granted summary judgment in Plaintiffs' favor on June 17, 2015.

## STATEMENT OF FACTS

Plaintiffs Kenneth and Norma Caquelin own two parcels of land in Franklin County, Iowa that were subject to an easement for railroad purposes—for which the United States does not dispute. The North Central Railway Association, Inc. ("NCRA") eventually acquired the line and held an easement for railroad purposes over Plaintiffs' land until 2013. Appx41. On May 13, 2013, NCRA filed a petition for abandonment with the STB stating that there had been no traffic on the line for at least five years. Appx27. On June 26, 2013, the City of Ackley and the

Iowa Natural Heritage Foundation filed a request for a NITU (Appx77-79) and the STB issued a NITU on July 3, 2013.  Appx80-84.

The NITU provided for a 180-day period so the railroad could negotiate a trail use agreement and, absent an extension, that the NITU would expire and the railroad could then abandon the line.  On October 15, 2013, a trail use request was filed with the STB and negotiations ensued to convert the rail corridor to a public recreational trail with the possible future reactivation as a railroad.  On December 6, 2013, the Iowa Natural Heritage Foundation requested an additional 180 days to continue negotiations but the railroad never consented.  As a result, the NITU expired on December 30, 2013, the railroad consummated regulatory abandonment of the line on March 31, 2014, and the railroad formally notified the STB that it had exercised the authority to fully abandon the line on April 24, 2014.

The issuance of the NITU by the STB had the effect of forestalling or blocking the property interests of the Caquelins.  *See Preseault I*, 494 U.S. at 8.  In *Preseault I,* the Supreme Court held that the Fifth Amendment requires the United States to pay compensation under the Tucker Act, 28 U.S.C. § 1491(a), to landowners whose "reversionary" interests in their property are forestalled or blocked by a Rails-to-Trails conversion.  494 U.S. at 11-17.  This basic principle has been affirmed and reaffirmed by this Court in *Preseault II*, *Caldwell*, *Barclay*, and *Ladd I.*

8

## SUMMARY OF ARGUMENT

In this case, the railroad only held an easement for railroad purposes, the Caquelins owned the underlying fee in the railroad corridor, and the first two liability prongs of *Preseault II* have been met.   Under longstanding and overwhelming precedent, when § 8(d) of the Trails Act is invoked by the STB, the state law reversionary property interests of adjacent landowners are blocked and a taking occurs.   The government's attempt to ignore binding precedent from *Preseault II, Caldwell, Barclay, Illig,* and *Ladd I* should be denied as frivolous, their attempt to seek *en banc* review should be denied as unnecessary, and this Court should summarily affirm the ruling of the CFC.

As this Court has repeatedly held, when a NITU is issued and the landowners' reversionary property interests are blocked, the taking may be temporary if no trail use agreement is ultimately reached.   The Federal Circuit has already rejected the government's notion that takings under the Trails Act should be examined as regulatory takings instead of physical takings and has specifically held that a taking occurs upon issuance of the NITU when the landowners are deprived of the use of their property by blocking their reversionary interests.

The Caquelins lost the right to exclusive use of their land on the date the NITU was issued because the STB invoked § 1247(d) of the Trails Act.   The government's argument that no trail use agreement was reached or that "factors"

should be considered only go to the extent of damages and the duration of the take and not to liability. The government's entire argument fails because the government already negotiated the amount of damages for the temporary taking and does not complain about or appeal that result.

## ARGUMENT

## I. THE GOVERNMENT IS LIABLE FOR A FIFTH AMENDMENT TAKING UNDER TWO DECADES OF FEDERAL CIRCUIT PRECEDENT

Trails Act jurisprudence began with *Preseault I* in 1990. The Preseaults, along with other property owners (hereinafter "Preseaults"), were Vermont property owners with land adjacent to the Vermont Railway, Inc.'s ("Railway") railroad right-of-way. The Preseaults sued to get their land back. Through a long and tortuous procedural morass,[5] the Preseaults' claim made its way to the Supreme Court.

The Supreme Court's decision in *Preseault I* was a unanimous decision delivered by Justice Brennan. Although the Court did not specifically address the

---

[5] For a description of the procedural history, including the initial quiet title action in Vermont state court, the dismissal because the ICC had not authorized abandonment, the appeal to the Vermont Supreme Court, the Preseaults' petition with the ICC, the Railway's notice seeking a "class exemption" for abandonment, the ICC's issuance of a CITU, the dismissal of the Petition before the ICC, and the Preseaults' appeal to the Second Circuit, *see Preseault v. Interstate Commerce Comm'n*, 853 F.2d 145 (2nd Cir. 1988).

merits of the Preseaults' takings claim,[6] the full Court unequivocally laid the foundation and provided the rulings for future takings claims pursuant to the Trails Act. The question presented to the Court was the constitutionality of the Trails Act under which railroad rights-of-way were authorized for conversion to recreational trails notwithstanding whatever reversionary property interests may exist under state law.

The Court examined the history and purpose of the Trails Act, the constitutionality of the Trails Act and the proper vehicle for property owners to receive just compensation for a taking under the Trails Act. The Court noted that the Tucker Act constitutes an implied promise to pay just compensation, which individual laws (such as the Trails Act) need not reiterate. Thus, the Court held that the Tucker Act provides jurisdiction to the Federal Court of Claims over claims against the government to recover damages founded on the Constitution and that the Tucker Act is the proper vehicle for property owners seeking a remedy for a taking pursuant to operation of the Trails Act.

The Supreme Court noted that the stated purposes of the Trails Act are (1) to encourage the development of additional recreational trails on an interim basis, and

---

[6] The Court did not address the merits of the Preseaults' takings claim because the Preseaults chose the wrong vehicle to assert their claim—they did not file their claim under the Tucker Act (however, and importantly, based on the Supreme Court's foundation, upon remand in *Preseault II*, the Preseaults' takings claim was validated and it was ordered that they were due just compensation for a takings, as more further discussed *infra*).

(2) to preserve federal jurisdiction over established railroad rights-of-way for future reactivation of rail service. *Preseault I,* 494 U.S. at 17. In light of the long history involved in attempting to address problems of losing federal jurisdiction over the network of railroad corridors due to rail abandonments, the Court concluded that Congress was entitled to make the judgment that every line is a potentially valuable national asset meriting preservation even if no future rail use for it is currently foreseeable. The stated purposes of the Trails Act are valid objectives if they are reasonably adapted. The Court held under a rational basis review, that the Trails Act provisions are a valid exercise of Congress' Commerce Clause Power because the stated purposes are valid objectives to which the Trails Act Amendments are reasonably adapted.

After the Court analyzed the Preseaults' claim challenging the constitutionality of the Trails Act and the determination that the Trails Act was constitutional, the Court went on to analyze whether a takings claim was a viable cause of action against the government for the blocking of the Preseault's reversionary interest in their land. The Court stated unequivocally that rails-to-trails conversions giving rise to just compensation claims were clearly authorized by the Trails Act. *Preseault I,* 494 U.S. at 13. The Court affirmed that state property laws dictate whether the railroad held an easement or fee interest, and thus, dictated the nature of the property interests held by property owners.

*Preseault I,* 494 U.S. at 8.  Further, under § 8(d)[7] of the Trails Act authorizing

issuance of a NITU, Congress intentionally prevented easement property interests

from reverting[8] to adjacent property owners under state law, which would occur

absent the Trails Act.  *Id*.  And, if Congress violated the Fifth Amendment by

precluding reversion of state law property interests, the Tucker Act is the available

remedy to property owners.  *Id*.  The rulings in *Preseault I* set the stage and laid

the foundation for future takings cases.

In *Preseault II*, the Federal Circuit explained that the key issue in the case

was whether <u>authorization</u> for the conversion by issuance of a NITU, under the

authority of the Trails Act, of a railroad right-of-way to a public recreational hiking

---

[7]  Section 8(d) of the Trails Act provides that, notwithstanding contrary state law, the right-of-way easement is authorized to be converted and may now be used for public recreation.  As a result, when the STB invokes this provision of the Trails Act, it redefines established state property laws thereby denying the owner his reversionary right to the land while perpetually forestalling the termination of the railroad easement.  This is the purpose and intent of § 8(d).  *See National Wildlife Federation v. I.C.C.*, 850 F.2d 694 (D.C. Cir. 1988); *Citizens Against Rails-to-Trails v. Surface Transportation Bd.*, 267 F.3d 1144, 1149 (D.C. Cir. 2001).

[8]  As noted by the Federal Circuit in *Preseault II*, 100 F.3d at 1533, the Courts use the term "reversion" as an alternative way to describe property transactions involving easements.  Instead of calling the property owner's retained interest a fee simple burdened by the easement, this alternative labels the property owner's retained interest following the creation of an easement as a "reversion" in fee.  Upon termination, however, instead of saying that the easement is extinguished and the fee interest becomes possessory; it is sometimes loosely said that the estate "reverts" to the owner.  Thus, the courts use the term "reversionary" as a convenient short-hand method for describing what happens to property interests when an easement would terminate.  *Id*.  So Plaintiffs have often used the same terminology in order to be consistent with the courts.

and biking trail constituted a taking of the property of the owners of the underlying fee simple estate. Whether a plaintiff is entitled to compensation under the Tucker Act in a Rails-to-Trails case depends on meeting two prongs of a three prong test—a taking occurs by issuance of a NITU if the railroad only held an easement (prong 1) and if one of the other two prongs are met, as specifically set out by the Federal Circuit in *Preseault II*:

> (1) who owned the strips of land involved, specifically did the Railroad… acquire only easements, or did it obtain fee simple estates;

> (2) if the Railroad acquired only easements, if the terms of the easements were limited to use for railroad purposes, then the authorization for future use as public recreational trails constituted a taking [*i.e.*, exceeds scope of the easement]; or

> (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, if the easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements then a taking occurred [*i.e.*, abandonment of the easement].

*Preseault II,* 100 F.3d at 1533.

Subsequent to the *Preseault II* determination in 1996 that a takings had occurred, the Federal Circuit on at least seven separate occasions has repeatedly and consistently addressed and affirmed the principles set forth in *Preseault II* that a taking occurs pursuant to the Trails Act when the STB invokes § 8(d) and when a railroad only holds an easement limited in scope to railroad operations and a "trail"

or different public use is authorized and exceeds the scope of the original railroad

easement:

- In 2004, the Federal Circuit decided *Toews*, affirming that a takings occurs when the NITU is issued implementing the Trails Act and reversion of a railroad purposes easement is blocked. 376 F.3d at 1376.

- Also, in 2004, in *Caldwell*, 391 F.3d 1229, the Federal Circuit held that the date a takings claim accrues is upon issuance of the NITU–the date of the "taking." The court set forth that the Trails Act, through the "railbanking" process, <u>prevents</u> the operation of state laws that would otherwise come into effect upon what would have been an abandonment, and thus "would result in extinguishment of easements <u>for railroad purposes</u> and reversion of rights of way to abutting landowners." *Id.* at 1229 (emphasis added). The taking ultimately occurs under the Trails Act when the NITU is issued and authorization for a railroad right-of-way is to be converted to interim trail use and "state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." *Id.* at 1233.

- In 2005, the Federal Circuit decided *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005), and confirmed that a taking occurs one of two ways under the Trails Act upon issuance of a NITU—either because a trail or public use easement exceeds the original railroad easement, OR, the railroad easement is abandoned or expires prior to the issuance of the NITU.

- In 2006, the Federal Circuit decided *Barclay,* 443 F.3d 1368, further noting that the taking occurs upon issuance of the NITU and such a taking occurs whether or not there is a trail use agreement or actual trail use of the former railroad easement.

- In 2009, in *Ellamae Phillips,* the Federal Circuit affirmed that if a railroad obtained an easement limited to railroad purposes then, upon issuance of a NITU, a "taking" of the property owners' land occurs and "just compensation" is owed. 564 F.3d 1367.

- In 2010, in *Bright v. United States*, 603 F.3d 1273 (Fed. Cir. 2010) the Federal Circuit reaffirmed all of the *Preseault II* principles and also further clarified that the filing of a class action for a Trails Act taking tolls the statute of limitation for the entire putative class.

- Also, in 2010, in *Ladd I*, 630 F.3d 1015, the Federal Circuit again affirmed that when a railroad obtained an easement for railroad purposes and a NITU blocks the reversionary interests of the property owner's rights to the use of their land **<u>unencumbered</u>** by an easement, a taking occurs requiring just compensation whether or not a trail ever burdens the land.

The Trails Act provides, "use [of otherwise abandoned railroad rights-of-way as public recreational trails] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). The STB's issuance of the NITU "destroyed" and "effectively eliminated"[9] the Caquelins' state law right to unencumbered title and exclusive possession of their land.[10] *See Caldwell*, 64 Fed. Cl. at 613, *Barclay*, 443

---

[9] *Ladd I*, 630 F.3d at 1019 ("It is settled law that a Fifth Amendment taking occurs in Rails-to-Trails case when government action *destroys* state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement.") (emphasis added) (citing *Ellamae Phillips Co.*, 564 F.3d at 1373); *Caldwell*, 391 F.3d at 1228 ("We have previously held a Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are *effectively eliminated* in connection with a conversion of a railroad right-of-way to trail use.") (emphasis added) (citing *Preseault II*, 100 F.3d at 1543).

[10] We use "reversionary" in the generic sense as the term was used by the Federal Circuit in *Barclay*, 443 F.3d at 1371, consolidated on appeal with *Renewal Body Works v. United States*. "We note in passing that as a matter of traditional property law terminology, a termination of the easements would not cause anything to 'revert' to the landowner. Rather, the burden on the easement would simply be extinguished, and the landowner's property would be held free and

F.3d 1368; *Toews*, 376 F.3d at 1376; *Hash*, 403 F.3d at 1311-12; *Bright*, 603 F.3d at 1276; *Ellamae Phillips*, 564 F.3d 1367; and *Ladd I*, 630 F.3d at 1020.   The STB's order denying the Caquelins' exclusive possession of their land is a compensable taking under *Preseault II* even though temporary.

This federal law, which "destroys" or "effectively eliminates" landowners' state law rights to unencumbered possession of their land, is a compensable Fifth Amendment taking because the railroad only held an easement to use the strip of land as a right-of-way across the land.   In other words, the railroad can only use the land for a "railroad purpose."   The authorization for public recreation is not a railroad purpose and exceeds the scope of the easement.   *See Toews,* 326 F.3d at 1376-77 ("And it appears beyond cavil that use of these easements for a recreational trail—for walking, hiking, biking, picnicking, Frisbee playing… is not the same use made by a railroad").   In *Preseault I*, the Supreme Court held the Trails Act gives rise to a taking for which the Fifth Amendment requires the United States to justly compensate the landowner because, as here, "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests… [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations." *Preseault I*, 494 U.S. at 8.

---

clear of any such burden."   *See Toews*, 376 F.3d 1371 at 1376; *see also Preseault II*, 100 F.3d at 1533-34.

The Supreme Court rejected the notion that Congress can redefine existing property interests without violating the Fifth Amendment's obligation to justly compensate the owner for the taking of the property.[11]   The Supreme Court reiterated this principle noting that it is "a taking if [the government] recharacterize[s] as public property what was previously private property." *Stop the Beach Renourishment, Inc. v. Fla. Dept. of Envtl. Protection*, 560 U.S. 702, 713 (2010), citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 163–65 (1980).

The Federal Circuit has repeatedly declared that, if the railroad held an easement for railroad purposes, the STB's issuance of a NITU invoking §1247(d) to forestall state law termination of the easement authorizes a new and different use of the land that is a compensable taking for which the Fifth Amendment compels the government to justly compensate the owner. *See Caldwell,* 391 F.3d at 1234; *Barclay,* 443 F.3d at 1371.  In *Ladd I*, the Federal Circuit explained this is so because "the NITU is the government action that prevents the landowners from

---

[11] *See Leo Sheep Co. v. United States*, 440 U.S. 668, 687–88 (1979) ("This Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation.").  *See also Hastings & D.R. Co. v. Whitney*, 132 U.S. 357 (1889); *Preseault II* at n.13 ("[property] interests were fixed at the time of their creation").

possession of their property unencumbered by the easement." *Ladd I*, 630 F.3d at 1023.

As longstanding precedent dictates, the touchstone of a Trails Act takings analysis according to the United States Supreme Court is to determine "what interest petitioners would have enjoyed under [state] law, in the absence of the ICC's recent actions [*i.e.* the issuance of the NITU]." *Preseault I*, 494 U.S. at 21. The issuance of the NITU blocks the landowners' reversionary property interests, is the finite start and is a taking, whether permanent or temporary.

## II.   THIS COURT SHOULD DENY *EN BANC* REVIEW BECAUSE THIS COURT HAS PREVIOUSLY HELD *EN BANC* THAT THE GOVERNMENT'S INVOCATION OF § 8(d) OF THE TRAILS ACT GIVES RISE TO A TAKINGS CLAIM

### A. The Issuance of the NITU Marks the Finite Start to Either Temporary or Permanent Takings Claims

As previously stated, the invocation of § 8(d) of the Trails Act blocks the landowners' reversionary interests and a takings occurs. *Caldwell*, 391 F.3d at 1235. Just as the government acknowledged and argued in *Illig*, "it is true that, under *Caldwell*, landowners may seek compensation for an alleged taking immediately upon issuance of the NITU even though no trail use agreement is reached, and any taking that may later be found would only have been temporary." *Ladd I*, 630 F.3d 1015, 1025 (citing *Illig v. Unites States*, 274 Fed. Appx. 883 (Fed. Cir. 2008), *cert denied*, ---U.S.---, 129 S. Ct. 2860 (2009)).

The *Caldwell* case arose when the United States sought to avoid compensating landowners in Georgia by arguing that their claim for compensation was time-barred. The government argued that the six-year limitation period began to run when the STB first invoked § 8(d). This Court announced and affirmed this Court's "bright-line rule" that a Trails Act taking occurs when the STB first invokes § 8(d) by stating that "the issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." *Caldwell*, 391 F.3d at 1233-34.

The owners in *Caldwell* sought rehearing and the government opposed it. The government argued that unlike the usual physical occupation case, the landowner in a Trails Act taking case is already deprived of possession so the question is not when the landowner loses the right to possess the property (since he is already not in possession) but rather when he would otherwise have recovered ownership of the easement were it not for the operation of the Trails Act. The government specifically argued that the landowners' argument that the NITU works a regulatory taking and that a single government action under the Trails Act might work two separate takings is clearly incorrect because the government action cannot trigger two separate takings, one regulatory and one physical. This Court

rejected the landowners' arguments and denied rehearing with no dissent and the landowners sought a writ of certiorari to the Supreme Court which was denied.[12]

It is very interesting that the United States is asking this Court to overrule *Ladd I* and *Caldwell* and doesn't even mention this Court's holding in *Barclay,* which expressly and unequivocally affirmed *Caldwell*. This Court revisited the same argument in *Barclay,* which was combined on appeal with *Renewal Bodyworks, Inc. v. United States*, 64 Fed. Cl. 609 (Fed. Cl. 2005), one year later. The same panel that decided *Caldwell* heard this combined appeal and Judge Dyk wrote the majority decision over Judge Newman's dissent.

The landowners argued on appeal that, until an abandoned railroad right-of-way is actually physically converted to recreational trail use, there is no physical appropriation of the owner's property. The landowners argued that a Trails Act takings claim could not accrue until the railroad transferred its interest to the ultimate trail user pursuant to an order invoking § 8(d) and that the trail user physically occupied the landowners' land. In essence, the landowners argued that this Court's decision in *Caldwell* was wrongly decided. This Court rejected the landowner's arguments and affirmed its decision in *Caldwell*:

> We explained in *Caldwell* that "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are

---

[12] *See Caldwell*, 547 U.S. 826 (2005).

blocked from so vesting." *Caldwell*, 391 F.3d at 1233. Abandonment is suspended and the reversionary interest is blocked "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under § 8(d)" of the Trails Act. *Id*. <u>We concluded that "[t]he issuance of the NITU is the only *Government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way."</u> *Id.* at 1233-34 (emphasis in original). <u>Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU.</u> We explicitly held in *Caldwell* that "[w]hile the taking may be abandoned ... by the termination of the NITU[,] the accrual date of a single taking remains fixed." *Id.* at 1235. <u>The issuance of the NITU is the only event that must occur to "entitle the plaintiff to institute an action."</u> *Creppel v. United States*, 41 F.3d 627, 631 (Fed. Cir. 1994). <u>Accrual is not delayed until a trail use agreement is executed or the trail operator takes physical possession of the right-of-way.</u>

*Barclay*, 443 F.3d at 1373 (emphasis added).

The landowners sought rehearing *en banc*. The government opposed rehearing and argued that the NITU was the only federal action that might allegedly constitute a taking by preventing the reversion of property rights under state law. The government, quoting *Caldwell*, actually stated that a taking occurs when the owner is deprived of use of the property, which in the context of the Trails Act occurs by blocking the easement reversion, and that the question is not when the owner loses the right to physically occupy the property but, rather, when the owner would otherwise have recovered full possession of the easement were it not for the operation of the Trails Act. After considering the government's

arguments this Court denied rehearing without dissent. The landowners filed a petition for a writ of certiorari to the Supreme Court that was denied.[13]

The *Illig* case followed a similar path. The government was found liable for a compensable taking, the properties were appraised, and the landowners and the Justice Department reached a settlement in which the government agreed to pay the 66 owners a total of more than $6,000,000. The settlement was to be approved in December of 2004 but, two days before the hearing to approve the settlement, this Court issued its decision in *Caldwell*. On the basis of *Caldwell*, the government withdrew from the settlement because the landowners' claims were now time-barred. The CFC followed this Court's holdings in *Caldwell* and *Barclay* and dismissed the *Illig* landowners' claims.[14]

The landowners appealed. In a unanimous decision, this Court affirmed the controlling authority of *Caldwell* and *Barclay* and summarily affirmed the CFC's dismissal of the claims as time-barred.[15] The landowners sought rehearing *en banc* which was denied without dissent. The landowners then petitioned for a writ of certiorari to the Supreme Court.

When the *Illig* Plaintiffs appealed to the Supreme Court arguing that the NITU does not trigger accrual, the government presented its argument in its

---

[13] *See Barclay*, 549 U.S. 1209 (2007).

[14] *See Illig*, 67 Fed. Cl. 47, 56 (Fed. Cl. 2005).

[15] *See Illig v. United States*, 274 Fed. App'x. 883, 884 (Fed. Cir. 2008).

response to the landowners' petition for certiorari by and through Elena Kagan,
who was then Solicitor General.   In the government's brief opposing certiorari,
Solicitor General Kagan wrote:

> The issuance of the NITU thus "marks the 'finite start' to either
> temporary or permanent takings claims."   When the NITU is
> issued, all the events have occurred that entitle the claimant to
> institute an action based on federal-law interference with
> reversionary interference therefore accrues on that date.   The
> fact that any taking resulting from the interference may later
> prove to have been temporary is irrelevant; as the court of
> appeals has explained, "[i]t is not unusual that the precise
> nature of the takings claim, whether permanent or temporary,
> will not be clear at the time it accrues."[16]

It is ironic that the United States is now asking this Court to overturn these
cases when the government argued that the NITU marks the accrual of a Trails Act
taking in all previous cases—and won that argument!   *See Caldwell, Barclay*, and
*Illig*.   As confirmed by the Federal Circuit and previously argued by the
Department of Justice over and over again, "[t]he NITU marks the 'finite start' to
either temporary or permanent takings claims by halting abandonment and the
vesting of state law reversionary interests when issued."   *Ladd I*, 630 F.3d at 1025
(holding a takings occurs even when no trail use agreement is reached and the
NITU expires).

---

[16] Brief of the United States in Opposition to Petition for Writ of Certiorari in *Illig
v. United States*, Supreme Court No. 08-852, at 9, citing *John R. Sand & Gravel
Co. v. United States*, 457 F.3d 1345, 1355-1356 (Fed. Cir. 2006), *aff'd*, 128 S.
Ct. 750 (2008) and *Caldwell*, 391 F.3d at 1234.

## B. The Government's Attempt to Override *Ladd I* and *Caldwell* Must Fail

The government did not like this Court's ruling in *Ladd I*. In *Ladd I,* the Federal Circuit stated that "The NITU is the governmental action that prevents the landowners from possession of their property unencumbered by the easement." *Ladd I*, 630 F.3d at 1023. The government sought rehearing *en banc* but the Federal Circuit denied the government's petition. All but two members (Gajarsa and Moore) voted to deny rehearing. Judges Gajarsa and Moore dissented, *not* because they disagreed with the Court's decision in *Ladd I*, but because they disagreed with *Caldwell*. The dissent acknowledged the law was settled and could only be changed by an *en banc* decision overturning *Caldwell, Barclay,* and *Ladd I*. They wrote, "*Our precedent, however, assumes that the issuance of a NITU is a physical taking.*" 646 F.3d at 912 (emphasis added). They explained that *Ladd I* merely applied the settled rule that "issuance of the NITU is a physical taking" of the owners' right to unencumbered possession of their land.

Incredibly, the government now attempts to distinguish *Caldwell* by observing that the STB's issuance of a NITU actually led to an interim trail use agreement in *Caldwell* and no such agreement was reached here. The government attempts to argue that in *Caldwell,* the Federal Circuit employed noncommittal language and specifically left open the question of whether issuance of a NITU itself was sufficient to trigger a temporary takings claim, noting that, "[t]his case

does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached." *Caldwell,* 391 F.3d at 1234, n.7.

But, this Court shut that door in *Barclay* two years later, which the government fails to even acknowledge. *Barclay* unequivocally and expressly affirmed *Caldwell.*[17] This Court made it perfectly clear that the issuance of a NITU, which blocks the landowners' reversionary interest, triggers accrual of a Trails Act taking. The government doesn't even address this Court's decision in *Barclay,* which expressly affirmed *Caldwell*, and held that the issuance of a "NITU triggers the accrual of the cause of action… emphasize[s] the correctness of the *Caldwell* rule" and "**supplies a single bright-line rule** for accrual that avoids [] consequences." *See Barclay*, 443 F.3d at 1378 (emphasis added).

The government now posits the proposition that a compensable taking does not occur until the railroad and trail user reach a trail use agreement. The government now states, completely contrary to its prior arguments which they won, that "It is now clear, however, that viewing the NITU as 'forestalling' reversionary interests, led the Court down the wrong path…The issuance of the NITU alone, absent a trail use agreement, merely provides a regulatory negotiating

---

[17] Although *Barclay* is controlling precedent, unbelievably, the United States mentions *Barclay* one time in their entire brief in a footnote citing to the dissent in *Barclay*. *See* Govt's Br., p. 35, fn. 13.

period, never implicates § 8(d) of the Trails Act, and does not 'fix the government's liability' for a physical taking."[18]   The government's argument has already and repeatedly been rejected by the Federal Circuit in *Caldwell, Barclay, Illig,* and *Ladd I.*

In *Ladd I*, the Federal Circuit rejected the federal government's arguments that events after the issuance of the NITU are relevant to liability and rejected the federal government's attempts to distinguish *Caldwell* and *Barclay*.   The government, instead of the landowners, sought rehearing and this Court denied rehearing.[19]   In a published decision, Judges Rader, Newman, Lourie, Bryson, Linn, Dyk, Prost, O'Malley, and Reyna voted to deny rehearing *en banc* and Judges Moore and Gajarsa dissented.   In their dissent, Judges Gajarsa and Moore noted "[o]ur precedent, however, assumes that the issuance of a NITU is a physical taking."   *Id.*   The government did not seek certiorari to the Supreme Court.[20]

The government first admits that *Ladd I* is binding precedent by stating that "this Court held that, under *Caldwell*, even if trail use does not actually later occur,

---

[18] *See* Govt's Br. at pgs. 35-36.

[19] *See Ladd I*, 646 F.3d 910 (Fed. Cir. 2011).

[20] After remand, the government found an earlier NITU and the government argued that the landowners claims were now time-barred, the CFC accepted the government's argument, and the landowners appealed back to the Federal Circuit.   The Federal Circuit, consisting of a panel composed of Judges Rader, Moore, and Lourie unanimously reversed.   This Court held that the issuance of the earlier NITU was inherently unknowable and that the Claim Accrual Suspension Rule applied.   *See Ladd II*, 713 F.3d at 652-53.   The government did not seek rehearing or certiorari.

a plaintiff may state a physical takings claim stemming from issuance of the NITU alone, as of the date when the government act occurs."[21]  After acknowledging the binding precedent, the government mistakenly argues that "the Court should overrule *Ladd I*'s holding that a Trails Act takings claim based on a NITU that lapses without a trail-use agreement must be treated as a physical takings claim."[22] The government's attempt to overrule *Ladd I* and *Caldwell*, and *Barclay* too, is not only contrary to overwhelming binding precedent, it is incorrectly based on the premise that a takings claim under the Trails Act "should be analyzed under a regulatory takings analysis."[23]

## III. THE TAKING OF LANDOWNERS' RIGHTS TO THE EXCLUSIVE PHYSICAL POSSESSION OF THEIR PROPERTY IS NOT A REGULATORY TAKING

### A. The Federal Circuit's Decisions in *Caldwell, Barclay, Illig, and Ladd I* Were All Compelled By, and Consistent With, the Supreme Court's Taking Clause Jurisprudence

The Supreme Court's takings clause jurisprudence generally falls into two different categories or types.  The first category is a "regulatory" taking that is generally defined by two essential features:  (1) it is an exercise of the government's police power to limit the "evil" or prohibit a nuisance; and (2) a regulatory taking does not dispossess the owner nor does the government acquire

---

[21] *See* Govt's Br. at p. 12 (citing *Ladd I,* 630 F.3d at 1023-24).
[22] *Id.* at p. 31.
[23] *Id.*

or occupy the property. The leading examples of regulatory takings are *Penn Central Trans. Co. v. New York City*, 438 U.S. 104 (1978) (historical preservation regulation limiting the redevelopment of property), *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002) (temporary moratorium on construction in the Lake Tahoe Watershed awaiting an environmental study), and *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) (ban on development on vacant lots under state's beachfront management statute). Regulatory takings cases may indeed require the United States to compensate the landowners, especially in those cases where the regulatory activity totally deprives the owner of all beneficial use of the property.

The second type of takings are "physical" takings. Physical takings occur when the landowners' property is directly appropriated, the landowners are practically ousted from possession, or the United States transforms private property into public property or imposes a servitude upon the landowners' property. Some of the leading examples of physical takings are *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (physical occupation of private rental property for installation of cable television), *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) (granting of public boating access to private marina), and *Kelo v. City of New London*, 545 U.S. 469 (2005) (city's exercise of eminent domain for economic development). In *Preseault I*, the Supreme Court placed the Trails Act

in the category of physical takings because it dispossesses the owner of the owner's state law property interest. *See Preseault I*, 494 U.S. at 23.

The Supreme Court's takings clause jurisprudence also speaks of "*per se*" takings. All physical takings are *per se* takings. *See Loretto*, 458 U.S. at 426 ("a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve"). In addition, all regulatory takings that deny the owner all economically beneficial use of the property are also *per se* takings. *See Lucas*, 505 U.S. at 1019 ("when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking"). For those regulatory takings that leave the owner in possession of their property and do not deny the owner all economically beneficial use of the owner's property, the Supreme Court then applies the *Penn Central* analysis to determine whether the owner is entitled to compensation. It is not necessary that the United States (or a third party acting under the government's authority) physically occupy the owner's property for there to be a *per se* taking. For example, when the government redefines an owner's state law property interest under the Trails Act, the government has engaged in a *per se* taking of the owner's property. *See Preseault I*, 494 U.S. at 23 ("[A] sovereign, '*by ipse dixit* may not transform private property into public property without compensation'").

Based on the Supreme Court's taking jurisprudence, the Supreme Court and this Court have consistently viewed "destruction" or "effective elimination" of a landowner's state law reversionary right to their land, even if only temporary, to be a *per se* physical taking. One of the most essential features of fee ownership of property is the right to possess the property and, coincident with this right, is the right to exclude others from the property. When § 8(d) of the Trails Act is implemented to "destroy" or "effectively eliminate" the landowners' state law reversionary interest in their land, the landowners' state law reversionary right is the ability to exclude anyone else from using the land once the railroad no longer operates a railway across the right-of-way. Before the STB invoked § 8(d) of the Trails Act, the owner enjoyed the right under state law to exclusive possession of the land that had once been used by the railroad. After the STB invokes § 8(d) of the Trails Act, the owner has no greater right to the use or possession of this strip of land than does the general public subject to the STB's continuing jurisdiction. This is a per se physical taking of the landowner's land.

### B. The Federal Circuit Has Already Ruled That Physical Occupation is Not Required and Has Already Rejected the Notion that the NITU is Nothing More Than a Temporary Regulatory Hold

In *Ladd I*, the government raised, and the Federal Circuit rejected, virtually identical arguments to those the government is now making—**"We reject the government's present suggestion that the NITU is nothing more than a**

**temporary regulatory hold** on the railroad's authority to abandon its railway." *Ladd I*, 630 F.3d at 1025 (emphasis added). The Federal Circuit then basically chastised the government's argument by saying "To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather… 'a mere restriction on its use' is to use words in a manner that deprives them of all their ordinary meaning." *Id, citing Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987).

*Ladd I* concerned landowners who owned tracts adjacent to a railway in Cochise County, Arizona. The landowners brought a Fifth Amendment takings action against the government after the STB issued a NITU suspending abandonment proceedings by the local railway. *See Ladd I*, 630 F.3d at 1017-18. After no trail use agreement was reached, the negotiating period was extended. *Id*. At the time that plaintiffs' claims were first considered on the merits, the NITU was set to expire the following year. The trial court concluded that no taking had occurred, reasoning that "[a] physical taking cannot have occurred in these circumstances, where neither the NITU nor another aspect of the federal abandonment process has resulted in construction of a trail for public use." *Ladd v. United States*, 90 Fed. Cl. 221, 226 (2009), *rev'd and remanded*, 630 F.3d 1015. The court justified its position by explaining that "[i]ssuance of a NITU cannot be

a physical taking where the landowners have not suffered a physical invasion of the property in which they claim interests." *Id*.

The Federal Circuit reversed. In doing so, the Court stated that it found the government's attempts to distinguish *Caldwell* and *Barclay* to be unpersuasive, reasoning:

> **In *Caldwell* and *Barclay*, we indicated that physical occupation is not required.** *See, e.g.*, *Barclay*, 443 F.3d at 1374 ("The barrier to reversion is the NITU, not physical ouster from possession."). Indeed, the *Barclay* appellants' claim accrued while the railroad was still operating. *Id.* "In general, a takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'" *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). **Because according to our precedent, a takings claim accrues on the date that a NITU issues, events arising after that date— including entering into a trail use agreement and converting the railway to a recreational trail—cannot be necessary elements of the claim. Hence it is irrelevant that no trail use agreement has been reached and that no recreational trail has been established.**

*Ladd I*, 630 F.3d at 1024 (emphasis added).

The Federal Circuit's decision in *Ladd I* is dispositive here, supported by *Caldwell*, *Barclay,* and *Illig* and all of this Court's Trails Act jurisprudence. The Court in *Ladd I* specifically addressed and contemplated the circumstance where a NITU is issued and no trail use agreement is reached. *See Ladd I*, 630 F.3d at 1025. As this Court specified, the action by the government that gives rise to a takings claim is the issuance of a NITU by the STB, regardless of the events that

follow.  *Id.* at 1025.  The court stated that "where no trail use agreement is reached, the taking may be temporary…  However, physical takings are compensable, even when temporary."  *Id.* (citing *Caldwell*, 391 F.3d at 1234; *Barclay*, 443 F.3d at 1348; *Hendler*, 952 F.2d at 1376 ("A taking can be for a limited term—what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute."); *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641-42 (1987)).

These statements from this Court squarely refute the government's assertion that the opinions in *Caldwell* and *Ladd I* don't really address or opine on whether an issuance of a NITU involves a compensable temporary taking when no agreement is reached.  In *Ladd I*, the Court concluded that "the duration of the taking goes to damages, not to whether a compensable taking has occurred."  *Id.* Despite the government's assertions, it is immaterial to liability whether the blocking of the reversionary interest was 6 months or 6 years.  It is also immaterial to Trails Act takings jurisprudence as to how long trains ran over the corridor or how long the Caquelins lived on their farm—as long as they owned the property on the date of the NITU which blocked their reversionary interest—and a taking accrued.

In an effort to ignore a century of Supreme Court precedent and decades of Federal Circuit precedent, the government attempts to argue that a temporary physical taking should be analyzed using some set of "factors" that the government attempts to extrapolate from *Arkansas Game & Fish Comm'n. v. United States*, 133 S. Ct. 511 (2012).[24] The government's argument is simply wrong. The government lost *Arkansas Game & Fish*. In *Arkansas Game & Fish*, the case involved a dam that the Corp of Engineers managed and the Corp would intermittently and temporarily flood the downstream land. The government made the bizarre argument that the government could only be liable for flooding land upstream of a dam. The Court rejected the government's argument and held that even temporarily taking an owner's property by flooding the owner's land was a *per se* taking for which the government had the "categorical duty" to compensate the owner. The Supreme Court specifically held that "[w]hen the Government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." *Arkansas Game & Fish*, 133 S.Ct. at 518 (emphasis added). Simply put, *Arkansas Game & Fish* provides

---

[24] The government also argues that a Trails Act taking should be viewed as a regulatory takings under *Penn Central*. Of course, this is the exact opposite argument the government made in *Illig*, but, regardless, Trails Act takings are physical takings of the landowners' exclusive right, physical use, and enjoyment of their land. *See Preseault I, Preseault II, and Ladd I.*

no support for the government's regulatory argument and no support on damages either.

### C. The Government's Attempt to Relitigate Settled Law is Frivolous

The government complains that there has been "an onslaught of takings litigation, in which attorneys' fees are guaranteed regardless of the size of the conveyances awarded to Plaintiffs,"[25] but that is laughable.  Only if plaintiffs win their case can they be awarded fees, and if they do not win, no attorneys' fees are awarded.  It is obvious that the federal government should have told the Caquelins they were taking property rights from these landowners in the first place and avoided having people sue the government for their silent takings of property rights.  The government has the argument completely backwards.  The federal government doesn't tell these landowners that they are taking their land via the Trails Act, rather, these landowners have to sue the federal government and prove their claims.  It is a matter of clear public policy and the United States Constitution dictates that if the federal government takes private land for a public purpose, the landowner is entitled to just compensation.

The government's complaints regarding attorney's fees is a mere attempt to shift the focus from what is legally important and an attempt to avoid the Fifth Amendment and the Constitutional obligation to pay landowners when it takes

---

[25] *See* Govt's Br. at p. 2

private land for a public purpose.[26]  Furthermore, if the government would pay these landowners at the get-go (as Plaintiff's counsel requested in this case) the attorney's fees would be minimal but, instead, the government fights and litigates every issue, as in this case, driving up attorney's fees.  So it is the federal government who drives up attorneys' fees, not the plaintiffs' attorneys.

Moreover, the government ignores the fact that in these Trails Act takings cases, through statues enacted by our government, the government takes landowners' rights to their land—taking private land for a public purpose—yet, the government attempts to say that no taking occurred because the invasion was minimal?  The government is trying to circumvent decades of Trails Act jurisprudence and tail spin the law.  The bottom line is that the law is well-settled and the government should be bordering on Rule 11 on this precise argument. Appalling as it may seem, it appears that the government will make any argument at any time and will flip-flop on their previous arguments and positions when necessary to avoid paying just compensation to property owners when the government takes their land.

Another instance of the government's scorched earth tactics is apparent in *Brandt v. United States*, 134 S. Ct. 1257 (2014).  In *Brandt*, the Justice Department

---

[26] It is the government's scorched-earth litigation strategy that actually causes large attorneys' fees.  This case is a perfect example because the government could have paid $900 to the Caquelins and attorneys' fees would have been quite minimal.

attempted to avoid paying property owners when the government takes their property under the Trails Act. The Justice Department actually brought a quiet title case against the Brandt family in Wyoming and claimed that the government owned the land under the railroad right-of-way easements granted in the 1875 Land Act. The government said the 1875 Land Act granted railroads title to the fee estate in the land under the railway line (not an easement to use the land for operation of a railroad) and, therefore, when the railroad abandoned the railway line the property did not "revert" to the adjoining fee owners. The Brandt family claimed that, as fee owner of the land, when the railroad ceased using the strip of land for operation of a railway, the easement terminated and their land was no longer encumbered with the right-of-way easement. *Brandt* was an important case because 1875 Act railroad rights-of-way cover much of the Western United States from Wisconsin to California.

The government had already lost its argument concerning the 1875 Act twice in *Samuel C. Johnson 1988 Trust v. Bayfield Cnty., Wis.*, 649 F.3d 799 (7th Cir. 2011) and in *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005). But the Tenth Circuit ruled in the government's favor. The owners appealed and the Supreme Court reversed the Tenth Circuit and rejected the government's argument. Chief Justice Roberts wrote the Court's decision.

The Supreme Court held the easements granted railroads under the 1875 Act were common law easements just like other railroad right-of-way easements. The Court held a railroad right-of-way easement is a limited right to use the strip of land for operation of a railroad and, when the railroad no longer operated, the easement terminated and the owner of the fee estate enjoyed unencumbered title to the land and the exclusive right to possess the property. *Id.* at 1265 (citing Restatement (Third) of Property: Servitudes § 1.21(1) (1998)). The Supreme Court also looked to Professor Ely's work on railroad easements as authority. *Brandt*, 134 at 1260 (citing J. Ely, Railroads and American Law 51 (2001)).

The Federal Circuit does not like the Justice Department's frivolous and wasteful litigation strategy in similar Trails Act taking cases. In *Evans v. United States*, 694 F.3d 1377, 1381 (Fed. Cir. 2012), the Federal Circuit rebuked the Justice Department. "The Government, however, foregoing the opportunity to minimize the waste both of its own and plaintiffs' litigation resources, not to mention that of scarce judicial resources, opposed plaintiffs' motions to stay, insisting that the district court suits proceed despite the pending appeal." *Id.* at 1379. The Federal Circuit found "[e]ven more puzzling is why the Government… pursued the course it chose in the district courts and in this appeal, seeking with every possible argument – even if so thin as to border on the frivolous – to avoid acquiescing in plaintiffs' effort to… proceed on the merits in the Court of Federal

Claims." *Id.*[27]

## IV. THE DURATION OF THE TAKING RELATES TO DAMAGES NOT LIABILITY

The government's argument has always been incorrectly based on the false premise that a takings is somehow determined by what the government received rather than what was taken. That view is totally upside down because it is what the landowner lost—not what the government gains—that determines the nature and extent of a taking. *Boston Chamber of Commerce v. Boston*, 217 U.S. 189 (1910). Here, the Caquelins lost the right to unencumbered title and exclusive use of their land on the date the NITU was issued because the STB invoked § 1247(d) of the Trails Act and what happened next only goes to the extent of damages and the duration of the takings.

The government fails to understand that it has a categorical duty to compensate the owner under the Fifth Amendment to the United States Constitution. The legitimacy of the government's exercise of eminent domain

---

[27] *See also St. Bernard Parish Government v. United States*, 121 Fed. Cl. 687, 747 (2015) (Judge Braden criticized the Justice Department for its litigation strategy, stating, "[i]n contrast [to the "open, transparent, and helpful" Army Corps of Engineers], the Department of Justice pursued a litigation strategy of contesting each and every issue"); Judge Sweeny recently mentioned sanctions to the Justice Department for its similar litigation strategy in *Hardy v. United States*, No. 14-388, Oct. 28, 2015 Oral Argument Tr. at 68; Judge Horn similarly observed in *Phipps v. United States*, No. 14-424L, the Justice Department's litigation strategy is contrary to binding precedent and asked the Justice Department why this Court would rule differently—"wing and a prayer?" *See Phipps* Oct. 1, 2015 Oral Argument Tr. at 12-13.

depends upon justly compensating the owner.  *See San Diego Gas & Elec. Co.* v. *San Diego*, 450 U.S. 621, 654 (1981) ("This Court has consistently recognized that the just compensation requirement in the Fifth Amendment is not precatory: once there is a "taking" compensation must be awarded.").  *See also Preseault I* ("[A] sovereign, by *ipse dixit*, may not transform private property into public property without compensation.") (O'Connor, J., concurring),[28] *Arkansas Game and Fish*, 133 S. Ct. at 518 (when the government takes an owner's property the government has a "categorical duty" to justly compensate the owner), *Horne* v. *Department of Agriculture*, 135 S. Ct. 2419, 2428 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home").

The government wrongly attempts to conflate the duration of the taking and the issue of damages.  The fact that the taking in this case may be temporary in nature does not change the fact that compensation is owed.  The Supreme Court made this precise point in *Lucas* when it wrote "Of course, the State may elect to rescind the regulation and thereby avoid having to pay compensation for a permanent deprivation.  But 'where the [regulation has] already worked a taking of all use of property, no subsequent action by the Government can relieve it of the duty to provide compensation for the period during which the taking was

---

[28] Quoting *Ruckelshaus* v. *Monsanto*, 467 U.S. 986, 1012 (1984) (internal quotations omitted).

effective.'"[29]  If the government takes your land for "only" six months or one year instead of permanently dispossessing you from your land, it does not mean the government didn't take your land for six months or one year, it just means that the compensation the government owes you is for six months, not the entire value of the land.

The Fifth Amendment compels the government to pay the owner "a full and exact equivalent" of what the owner lost. *Monongahela Nav. Co. v. United States*, 148 U.S. 312, 326 (1893).  The government must put the owner in "as good [a] position pecuniary as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943).  *See also Kirby Forest Ind. Inc. v. United States*, 467 U.S. 1, 10 (1984).  The Supreme Court's Fifth Amendment jurisprudence makes it clear beyond cavil that a taking is defined by what the owner lost – not what the government gained.

Under the Trails Act, what the owner lost is the right to unencumbered title and to the exclusive use and possession of his land.  The Caquelins lost this right to their property when the STB invoked § 1247(d) of the Trails Act.  The STB's invocation of the Trails Act results in the preemption of state law and is the event that "destroys" and "effectively eliminates" an owner's state law right to their property.  After the STB first invokes § 1247(d) of the Trails Act, the STB's

---

[29] *See Lucas*, 505 U.S. 1003, 1031 n. 17 (quoting *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 321 (1987)).

preemption of the fee owner's right to their property is perpetual. The taking does not end until the STB vacates the original order invoking the Trails Act and no longer asserts jurisdiction over the owner's property.

Overturning this Court's "bright-line rule," which was announced in *Caldwell* and affirmed in *Barclay*, *Illig*, and *Ladd I,* would unsettle land title. As this Court rightly noted in *Caldwell* and *Barclay,* any holding without the "bright-line rule" would cast Trails Act takings adrift without any clear rule to establish when a Trails Act taking claim accrues and when the statute of limitations begins to run. Is it when the railroad first reaches an agreement to sell the abandoned right-of-way to a trail-user? If so, what happens if (as in *Caldwell*) the railroad and trail-user amend the agreement, make the agreement contingent upon future events or assign the agreement to a different trail-user? Or, is it when the railroad conveys title to the trail-user? Or when the trail-user constructs a public trail across the land?

Any change in this well-settled law now would only create chaos. In *Leo Sheep Co*, the Supreme Court noted, "this Court has traditionally recognized the special need for certainty and predictability where land titles are concerned, and we are unwilling to upset settled expectations to accommodate some ill-defined power to construct public thoroughfares without compensation." *See Leo Sheep*, 440 U.S. at 687–88. In *Brandt,* the Supreme Court reaffirmed this exact principle by saying

43

"We decline to endorse [the Government's] stark change in position, especially given 'the special need for certainty and predictability where land titles are concerned.'" *See Brandt*, 134 S. Ct. at 1268 (quoting *Leo Sheep*, 440 U.S. at 687).

But, now, the Government wants to run with the fox and hunt with the hounds. The federal government now wants this Court to overturn *Caldwell*, *Barclay*, *Illig*, and *Ladd I* and adopt a new rule that basically says that Trails Act takings do not occur until the railroad and trail-user reach a trail-use agreement. The government simply cannot have it both ways. If this Court adopts the government's flip-flop, the Trails Act would now give rise to multiple different takings accruing at different times and, as a practical matter, the government asks this Court to adopt an entirely unworkable standard. And what of the *Caldwell*, *Barclay*, and *Illig* families and thousands of other owners whose land the government admittedly took but who were denied their constitutional right to be justly compensated because under this Court's "bright-line" rule a Trails Act taking occurs when the government first invoked § 8(d) of the Trails Act? Is the Federal Circuit to send them a note of apology—"sorry we were wrong. You were denied your constitutional rights because we accepted the government's argument which we now reject?"

The value of the temporary take in this case is not even at issue, has been settled, and has not been appealed. The government actually forced Plaintiff's

counsel to litigate liability, in spite of overwhelming well-settled precedent, and it wasn't until liability was determined that a settlement on land value was reached. In fact, the government has forced Plaintiff's counsel to litigate every aspect of this case that could have been resolved for a minimal amount of money, including a minimal amount of attorney's fees.  But, most importantly, because the issue of damages has been settled and not appealed, all of the government's arguments that go to the issue of damages or purported factors to be considered when determining the extent of the damages are fallacious at best.

## V.    CONCLUSION

The government's appeal is nothing more than a blatant attempt to relitigate well-settled issues of law.  A temporary physical takings occurred in this case when the STB implemented § 8(d) of the Trails Act.  As a result, there is no need for an *en banc* review of the issues in this case and the Court of Federal Claim's ruling should actually be summarily affirmed.

Respectfully submitted,

Stewart, Wald & McCulley, L.L.C.

By  /s/ *Elizabeth McCulley*
Elizabeth McCulley
Thomas S. Stewart
2100 Central, Suite 22
Kansas City, MO 64108
(816) 303-1500
(816) 527-8068 (facsimile)
stewart@swm.legal
mcculley@swm.legal

**ATTORNEYS FOR APPELLEES**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be shipped via overnight delivery to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

*/s/ Elizabeth McCulley*
**ATTORNEY FOR APPELLEES**

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 28.1(e)(3) and 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i).

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Federal Circuit Rule 32(b) because this brief contains 11,639 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(1)-(3).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

Respectfully submitted,

Stewart, Wald & McCulley, L.L.C.

By  /s/ *Elizabeth McCulley*
Elizabeth McCulley
Thomas S. Stewart
2100 Central, Suite 22
Kansas City, MO 64108
(816) 303-1500
(816) 527-8068 (facsimile)
stewart@swm.legal
mcculley@swm.legal

**ATTORNEYS FOR APPELLEES**